**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| In re,<br><br>Labsource, LLC,<br><br>                                  Debtor(s). | C/A No. 19-05161-HB<br><br>Adv. Pro. No. 21-80059-HB<br><br>Chapter 7 |
| John K. Fort, Trustee,<br><br>                                  Plaintiff(s),<br><br>v.<br><br>Aaron Kibbey, individually and as Chief Restructuring Officer of Oaktree Medical Centre, PC; Timothy Daileader, individually and as Independent Director of Oaktree Medical Centre, PC; Huron Consulting Services, LLC aka Huron Consulting Group; Mark Freedlander, David Pivnick, McGuireWoods LLP,<br><br>                                  Defendant(s). | **ORDER REGARDING MOTION TO DISMISS FILED BY HURON CONSULTING SERVICES, LLC & AARON KIBBEY** |

**THIS MATTER** is before the Court on the Motion to Dismiss filed by Defendants Huron Consulting Services, LLC ("Huron") and Aaron Kibbey (collectively, "Huron Defendants"), seeking dismissal of the Amended Complaint filed by John K. Fort, the Chapter 7 Trustee administering the bankruptcy estates of Oaktree Medical Centre, P.C., Oaktree Medical Centre, LLC, and Labsource, LLC (collectively, "Debtors").[1] The Huron Defendants contend the arbitration provision of Huron's Engagement Agreement with the Debtors requires the Court to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(3) and (6)[2] and the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* ("FAA"). If any causes of action are not arbitrable, the Huron

---

[1] ECF Nos. 37 & 38, filed Dec. 21, 2021. The Trustee filed identical Amended Complaints in two other adversary proceedings, Adv. Pro. Nos. 21-80057-hb and 21-80058-hb, but the matters have not been consolidated. Identical Motions were filed by the Huron Defendants therein and identical orders will be entered in each adversary proceeding.
[2] Made applicable to this adversary proceeding by Fed. R. Bankr. P. 7012.

Defendants assert those claims should be stayed pending arbitration or dismissed under Fed. R. Civ. P. 12(b)(1) for lack of standing. The Motion has been fully briefed[3] and is ripe for disposition.

## ALLEGATIONS OF THE COMPLAINT[4]

This adversary proceeding concerns issues with the performance of professionals retained by the Debtors to aid in restructuring. The Debtors comprised a privately-owned pain management practice. After the Debtors' failed to repay their matured secured credit facility, the lenders exercised a contractual remedy by terminating the owner's rights and appointing Defendant Tim Daileader as Independent Director/Manager. After Daileader assumed control of the Debtors, he retained Huron Transaction Advisory ("HTA") to assist with a debt financing transaction. Complications with the Debtors' operations arose, including raids conducted by the Federal Bureau of Investigation, Drug Enforcement Agency, and U.S. Department of Health and Human Services at various facilities. At that time, the Debtors transitioned from HTA to Huron for general turnaround and restructuring services, including engagement of a chief restructuring officer.

Huron and the Debtors executed an Engagement Agreement that placed Kibbey in the role of MSO-level Chief Restructuring Officer and tasked the Huron Defendants with overseeing and implementing a restructuring plan.[5] The Engagement Agreement includes the following arbitration provision:

---

[3] *See* ECF Nos. 47 (the Trustee's Memorandum in Opposition, filed Jan. 26, 2022), 52 (the Trustee's Supplemental Memorandum in Opposition, filed Feb. 4, 2022); 59 (the Huron Defendants' Reply in Support of Motion to Dismiss, filed Feb. 9, 2022), and 66 (the Trustee's Memorandum in Sur-Reply to the Motion, filed Feb. 23, 2022). The Trustee's original complaint was filed on September 17, 2021. The Huron Defendants, as well as others, filed a motion to dismiss. (ECF Nos. 15 & 16, filed Nov. 3, 2021). On December 7, 2021, the Trustee filed a response to the Huron Defendants' motion and an Amended Complaint, mooting the motion to dismiss.

[4] The following is a summary of the allegations of the Amended Complaint and does not reflect any finding of fact by the Court.

[5] The Amended Complaint alleges that regulatory compliance, including proper implementation of a management services organization ("MSO"), was required for the corporate restructuring. It alleges: an MSO generally refers to a health care specific administrative and management engine that provides a host of non-clinical administrative and practice management functions to a medical practice; a primary advantage of an MSO is to have access to management services and to ensure the lowest prices on supplies and services; critical components of an MSO centralize the administrative and management functions of health practices to leverage resources efficiently and allow providers to

> This agreement shall be governed by and construed in accordance with the laws of the State of Illinois without giving effect to conflict of law rules. The parties hereto agree that any and all disputes or claims arising hereunder shall be settled by binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Any arbitration will be conducted in Chicago, Illinois. Any arbitration award may be entered in and enforced by any court having jurisdiction thereof, and the parties consent and commit themselves to the jurisdiction of the courts of the State of Illinois for purposes of any enforcement of any arbitration award. Except as may be required by law, neither a party nor an arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of both parties.

The various professionals working for the Debtors failed to effectuate an MSO and no restructuring plan was developed or implemented allegedly due, in part, to issues related to Huron and Kibbey's competence and performance. When the professionals realized a restructuring was not tenable, they proposed a Chapter 11 reorganization that required additional funding from the lenders. After the lenders refused, Chapter 7 preparations began. Huron attempted to liquidate the Debtors' assets as quickly as possible to realize payments for only the professionals' fees.

On September 18, 2019, Debtors paid Huron its final invoice of $148,734.00. The next day, Debtors filed separate voluntary petitions for Chapter 7 relief in the U.S. Bankruptcy Court for the Western District of North Carolina. Venue was transferred to this Court on September 30, 2019, and the Trustee was appointed in all three cases. Huron filed three proofs of claim in each case: two for professional fees in the amounts of $49,366.39 and $1,034,422.50; and an indemnification claim for an undetermined amount.

The Trustee asserts the professionals mismanaged the Debtors, causing harm to the estates and ultimately all creditors by diminishing the Debtors' assets, increasing the Debtors' liabilities, and prioritizing payment of their own professional fees over payments to creditors while operating

---

focus on providing quality clinical care to patients; and one of the purposes is to find "at risk" or non-compliant billing practices and recommend corrective action plans and best practices for compliance to meet regulatory requirements or billing guidelines.

the Debtors and/or working for the Debtors in a fiduciary capacity.  On September 17, 2021, the Trustee filed this adversary proceeding seeking recovery from Huron for the benefit of the estate and creditors.  After the Huron Defendants and others filed motions to dismiss, the Trustee filed an Amended Complaint on December 7, 2021, addressing deficiencies.  The Amended Complaint added allegations that as a result of breaches of the Engagement Agreement and a failure to perform duties, Huron's proofs of claim should not be allowed.  It includes a prayer for relief for "[f]ull adjudication by this Honorable Court of the issues and facts presented by the Parties in the pleadings, proofs of claim, discovery, and any issues presented by the core of operative facts related to Defendants' performance of its duties to Debtors or those services which should have been performed."  The only other allegation regarding Huron's proofs of claim is "Huron had the audacity to file a Proof of Claim within the Debtors' Estates for the time they spent *over* the [contractual] cap, *and* demanded and received a retainer for post-petition work." (emphasis in original).

The Amended Complaint asserts the Huron Defendants and others mismanaged the Debtor and did not perform as intended, breached their common law duties and duties under the Engagement Agreement, caused damage to the Debtors and, consequently, damage to all creditors by being paid professional fees of $2,160,120.86 to Huron and $250,000.00 to HTA while the Debtors' liabilities grew.  Therefore, the Trustee asserts Huron is not entitled to payment of its proofs of claims and the Trustee is entitled to an award of damages on behalf of the Debtors' estates and/or the creditors by asserting the following causes of action against the Huron Defendants: Breach of Fiduciary Duty; Aiding and Abetting Breach of Fiduciary Duty; Negligence/Professional Malpractice; Fraud; Civil Conspiracy; Unjust Enrichment; and Breach of Contract (collectively, "State Law Claims").  The Trustee also asserts causes of action against the

Huron Defendants for: Actual Fraud under § 548(a)(1)(A); Constructive Fraud under § 548(a)(1)(B); Preference under § 547; and Recovery of All Transfers under § 550 (collectively, "Avoidance Actions"). While no specific damages amount is alleged, a fair reading of the Amended Complaint indicates the Trustee is seeking amounts that surpass Huron's proofs of claim.

### DISCUSSION AND CONCLUSIONS

**I.  ARBITRATION**

The Huron Defendants assert all causes of action brought against them must be dismissed because they are subject to the Engagement Agreement's arbitration provision. Although no Federal Rule of Civil Procedure expressly addresses motions to dismiss or stay pending arbitration, the Fourth Circuit has observed that an arbitration clause is "a specialized kind of forum-selection clause," and "a motion to dismiss based on a forum-selection clause should be properly treated under Rule 12(b)(3) as a motion to dismiss on the basis of improper venue." *Aggarao v. MOL Ship Mgmt. Co. Ltd.*, 675 F.3d 355, 365 n.9 (4th Cir. 2012) (citations omitted). However, dismissal under Rule 12(b)(3) *"depends* exclusively on whether the court in which the case was brought satisfies the requirements of federal venue laws." *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 55 (2013). A forum-selection clause and, thus, an arbitration provision, does not itself make venue improper. *Id.*

Rather, Huron's Motion is best analyzed under the FAA, which "requires courts to enforce covered arbitration agreements according to their terms." *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1412 (2019) (citing 9 U.S.C. § 2). "The FAA requires a court to stay 'any suit or proceeding' pending arbitration of 'any issue referable to arbitration under an agreement in writing for such arbitration.' This stay-of-litigation provision is mandatory." *Adkins v. Lab. Ready, Inc.*, 303 F.3d

496, 500 (4th Cir. 2002) (quoting 9 U.S.C. § 3). "However, when every claim in a case must be submitted to arbitration, the court may dismiss the case instead of staying it." *Campbell v. Anesthesia Mgmt. Sols., LLC*, C/A No. 5:20-CV-3538-SAL, 2021 WL 4167530, at *2 (D.S.C. Sept. 14, 2021) (citations omitted); *Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 709-10 (4th Cir. 2001) ("As is relevant here, the FAA requires a district court, upon motion by any party, to stay judicial proceedings involving issues covered by written arbitration agreements. According to Choice, BSR's motion to dismiss was not a proper § 3 motion because the sole remedy available under § 3 is a stay. Notwithstanding the terms of § 3, however, dismissal is a proper remedy when all of the issues presented in a lawsuit are arbitrable." (citing 9 U.S.C. § 3)).

Under § 2 of the FAA, an arbitration contract is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." Thus, the FAA "establishes 'a liberal federal policy favoring arbitration agreements.'" *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, (1983)). "Underlying this policy is Congress's view that arbitration constitutes a more efficient dispute resolution process than litigation." *Adkins*, 303 F.3d at 500 (citing *Hightower v. GMRI, Inc.,* 272 F.3d 239, 241 (4th Cir. 2001)). Accordingly, "[a]ny uncertainty regarding the scope of arbitrable issues agreed to by the parties must be resolved in favor of arbitration." *Muriithi v. Shuttle Exp., Inc.*, 712 F.3d 173, 179 (4th Cir. 2013) (citations omitted); *see also Levin v. Alms and Assoc., Inc.*, 634 F.3d 260, 266 (4th Cir. 2011) ("The 'heavy presumption of arbitrability requires that when the scope of the arbitration clause is open to question, a court must decide the question in favor of arbitration.'" (quoting *Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co.*, 867 F.2d 809, 812 (4th Cir. 1989))).

The Supreme Court has "often observed that the [FAA] requires courts 'rigorously' to 'enforce arbitration agreements according to their terms . . .'" *Epic Sys.*, 138 S. Ct. at 1621 (quoting *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013)). "This stems from the 'fundamental principle that arbitration is a matter of contract,' and contracts should be enforced according to their terms." *In re Taylor*, 594 B.R. 643, 650 (Bankr. E.D. Va. 2018), *aff'd sub nom. Allied Title Lending, LLC v. Taylor*, 420 F. Supp. 3d 436 (E.D. Va. 2019) (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011)).

Disputes over arbitrability require a two-step process. *Peabody Holding Co., LLC v. United Mine Workers of Am., Int'l Union*, 665 F.3d 96, 101 (4th Cir. 2012). First, the Court must "determine *who* decides whether a particular dispute is arbitrable: the arbitrator or the court. Second, if [the court] conclude[s] that the court is the proper forum in which to adjudicate arbitrability, [it] then decide[s] *whether* the dispute is, in fact, arbitrable." *Id.*; *see also In re McPherson*, 630 B.R. 160, 170 (Bankr. D. Md. 2021) ("'first, [the court] must determine whether the parties agree to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then decide whether to stay the balance of the proceedings pending arbitration.'" (quoting *In re MF Glob. Holdings Ltd.*, 571 B.R. 80, 89-90 (Bankr. S.D.N.Y. 2017))).

### A. PARTIES BOUND BY THE ARBITRATION AGREEMENT

"As a general matter, 'arbitration is a matter of contract [interpretation] and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Am. Bankers Ins. Grp., Inc. v. Long*, 453 F.3d 623, 626-27 (4th Cir. 2006) (quoting *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH,* 206 F.3d 411, 416 (4th Cir. 2000)). In bankruptcy,

a Chapter 7 trustee wears more than one hat. A trustee who asserts a cause of action derived from the debtor's rights stands in the "shoes" of the debtor and "his rights are limited to the same extent as the debtor's under applicable non-bankruptcy law. If the debtor agreed in a pre-petition contract to arbitrate a dispute, the trustee, suing as successor to the debtor, is likewise bound by the arbitration clause." *MF Glob. Holdings*, 571 B.R. at 94 (quoting *In re Hagerstown Fiber Ltd. P'ship*, 277 B.R. 181, 206 (Bankr. S.D.N.Y. 2002)); *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1153 (3d Cir. 1989) ("the trustee-plaintiff stands in the shoes of the debtor for the purposes of the arbitration clause and that the trustee-plaintiff is bound by the clause to the same extent as would the debtor."). "On the other hand, a trustee who asserts claims that are not derivative of the debtor's rights stands in the 'overshoes' of the creditors of the debtor and generally is not bound by the terms of the prepetition agreements entered into by the debtor." *In re Huffman*, 486 B.R. 343, 355 (Bankr. S.D. Miss. 2013) (citing *Hagerstown*, 277 B.R. at 206-07).

> Avoidance claims are not derivative of the debtor's rights; rather, they are statutory claims created in favor of creditors that can only be prosecuted by a trustee or debtor in possession, or as in this case, by the Liquidating Trust as assignee under Debtor's confirmed chapter 11 plan. Claims that are derivative of a debtor's rights may be subject to arbitration. Claims that belong exclusively to a trustee or debtor in possession belong to creditors who were not parties to the arbitration agreement and, therefore, are not subject to arbitration.

*In re Bethlehem Steel Corp.*, 390 B.R. 784, 791-92 (Bankr. S.D.N.Y. 2008); *see also In re Friedman's, Inc.*, 372 B.R. 530, 546-47 (Bankr. S.D. Ga. 2007) (finding the debtor-in-possession's avoidance actions under §§ 544(b) and 548 were "Code-derived creditor claims and not arbitrable" because it was "not a successor-party to a debtor's pre-petition arbitration agreements.").

"Derivative claims constitute claims 'which are based upon a secondary effect from harm done to the debtor, and in the context of bankruptcy are 'ones that arise from harm done to the estate and that seek relief against third parties that pushed the debtor into bankruptcy.'" *Borg v. Warren*, 545 F. Supp. 3d 291, 317 (E.D. Va. 2021) (citations omitted); *see also In re Wilton*

*Armetale, Inc.*, 968 F.3d 273, 282 (3d Cir. 2020) ("Claims alleging that 'third parties . . . wrongfully deplete[d] the debtor's assets' are general or derivative because '[e]very creditor has a similar claim for the diversion of assets of the debtor's estate.'" (quoting *Tronox Inc. v. KerrMcGee Corp. (In re Tronox Inc.)*, 855 F.3d 84, 103 (2d Cir. 2017))); *In re Glo-Tex Int'l, Inc.*, C/A No. 07-06449-JW, 2010 WL 4916574, at *4 (Bankr. D.S.C. Nov. 30, 2010) (finding conversion of corporate funds by the directors caused injury to the debtor and every creditor constitutes a derivative action). "The theory of recovery for those claims is 'not tied to the harm done to the creditor by the debtor.' Rather, it is 'based on an injury to the debtor's estate that creates a secondary harm to all creditors regardless of the nature of their underlying claim[s] against the debtor.'" *Armetale*, 968 F.3d at 282-83 (quoting *Tronox*, 855 F.3d at 103-104).

The Trustee is not a successor-party to the Engagement Agreement with respect to his Code-created Avoidance Actions. Such claims are his alone and not derivative of the Chapter 7 Debtors' rights. Therefore, the Trustee's Avoidance Actions are not subject to arbitration and any request to dismiss such claims must be denied.

To the extent the State Law Claims against the Huron Defendants are asserted on behalf of the creditors, the Trustee failed to show how the claims are specific to any creditor. Rather, the claims as pled are common to all creditors and derivative of injuries to the Debtors. As the party asserting the State Law Claims derived from the Debtors, the Trustee stands in the shoes of the Debtors and is subject to the terms of the Engagement Agreement. Consequently, the Trustee is subject to the same defenses that could have been asserted against the Debtors, including arbitration.

B. *ARBITRABILITY OF STATE LAW CLAIMS*

Having found the Trustee is bound by the Engagement Agreement with regard to the State Law Claims, the Court must determine whether it has the authority to decide the arbitrability of such claims. "[P]arties may agree to have an arbitrator decide not only the merits of a particular dispute but also 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy.'" *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019) (quoting *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010)). The Supreme Court recently reiterated that it "has consistently held that parties may delegate threshold arbitrability questions to the arbitrator, so long as the parties' agreement does so by 'clear and unmistakable evidence.'" *Id.* at 530 (citations omitted).

"[B]road arbitration clauses that generally commit all interpretive disputes 'relating to' or 'arising out of' the agreement *do not* satisfy the clear and unmistakable test." *Simply Wireless, Inc. v. T-Mobile US, Inc.*, 877 F.3d 522, 527 (4th Cir. 2017), *abrogated in part on other grounds by Henry Schein*, 139 S. Ct. at 528-29 (emphasis in original) (citation omitted). However, courts frequently and consistently find that when the arbitration provision incorporates arbitration rules, including the commercial rules of the American Arbitration Association ("AAA"), there is clear and unmistakable evidence that the parties intended to arbitrate arbitrability. *See, e.g.*, *id.* at 528 (incorporating the Judicial Arbitration & Mediation Services rules); *JPay, Inc. v. Kobel*, 904 F.3d 923, 936-38 (11th Cir. 2018) ("[by] expressly incorporating . . . AAA rules," an arbitration clause "clearly and unmistakably give[s] the arbitrator power to rule on his own jurisdiction, thus delegating questions of arbitrability to the arbitrator"); *Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1284 (10th Cir. 2017) (collecting cases from multiple circuits); *Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*, 809 F.3d 746, 763-64 (3d Cir. 2016) ("It appears that virtually every circuit

to have considered the issue has determined that incorporation of the [AAA] rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." (citations omitted)); *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) ("[W]e hold that incorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability."); *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012) ("We agree with most of our sister circuits that the express adoption of [the AAA] rules presents clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." (citations omitted)). Under Rule R-7a of the AAA, "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim."

The Engagement Agreement provides that all disputes and claims arising thereunder shall be settled by arbitration in accordance with the AAA Rules, which expressly delegate the issue of arbitrability to the arbitrator. This incorporation provides clear and unmistakable evidence of the Debtors' intent to grant the arbitrator authority to decide "gateway" determinations, including whether the State Law Claims are arbitrable. As a result, the Court finds that the arbitrability of the State Law Claims should be decided by the arbitrator according to the Engagement Agreement.

### C. INHERENT CONFLICT WITH THE BANKRUPTCY CODE

Even if the Court could consider arbitrability, it would find the Trustee's State Law Claims must be sent to arbitration.

Although "the [FAA] requires courts 'rigorously' to 'enforce arbitration agreements according to their terms . . .'" *Epic Sys.*, 138 S. Ct. at 1621 (citation omitted), this may be overridden by a "contrary congressional command." *Shearson/Am. Express Inc. v. McMahon*, 482 U.S. 220, 226 (1987). The Court considers the following to determine congressional intent to override the

FAA: (1) the text of the statute; (2) its legislative history; and (3) whether there is "an inherent conflict between arbitration and the underlying purposes [of the statute at issue]." *Id.* at 227. The party opposing arbitration has the burden "to show that Congress intended to preclude a waiver of judicial remedies for statutory rights at issue." *Id.* (citations omitted). The Supreme Court has consistently reinforced the strong policy in favor of arbitration over a purported conflict with another statutory right. *See, e.g.*, *Epic Sys.*, 138 S. Ct. at 1621 ("A party seeking to suggest that two statutes cannot be harmonized, and that one displaces the other, bears the heavy burden of showing a clearly expressed congressional intention that such a result should follow. The intention must be clear and manifest. And in approaching a claimed conflict, we come armed with the strong presumption that repeals by implication are disfavored and that Congress will specifically address preexisting law when it wishes to suspend its normal operations in a later statute." (internal citations and quotation marks omitted)); *In re Bauer*, Adv. Pro. No. 20-80012-DD, 2020 WL 3637902, at *3 (Bankr. D.S.C. June 8, 2020) ("[W]hile the United States Supreme Court has never considered a conflict between the Bankruptcy Code and the FAA, it has rejected all other attempts to 'manufacture conflicts' with another federal statute to date, including with the National Labor Relations Act, the Securities Exchange Act of 1934, the Racketeer Influenced and Corrupt Organizations Act, the Credit Repair Organizations Act, and the Age Discrimination in Employment Act of 1967." (footnotes omitted)).

While the Fourth Circuit follows the strong policy favoring arbitration, it also recognizes "[a]t the same time, however, 'Congress intended to grant comprehensive jurisdiction to bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate.'" *Moses v. CashCall, Inc.*, 781 F.3d 63, 71 (4th Cir. 2015) (quoting *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995)). Upon discovery of congressional intent to

preserve judicial remedies for the statutory rights at issue, the bankruptcy court has the discretion to withhold arbitration. *See id.* at 71-72.  In general, the bankruptcy court does not have the discretion to decline to enforce an arbitration agreement relating to a non-core proceeding. *Id.* at 84-85 (Gregory, J., concurring).   However, arbitration of constitutionally core claims may "inherently conflict with the purposes of the Bankruptcy Code," and the bankruptcy court is generally within its discretion to refuse arbitration of such claims. *Id.*  Regardless of a core or non-core distinction, "what matters . . . is whether compelling arbitration for a claim would inherently undermine the Bankruptcy Code's animating purpose of facilitating efficient reorganization of an estate through the '[c]entralization of disputes concerning a debtor's legal obligations.'" *Id.* at 83 (Gregory, J., concurring) (quoting *Phillips v. Congelton, LLC*, 403 F.3d 167, 170 (4th Cir. 2005)).

A non-exhaustive list of core proceedings is provided in 28 U.S.C. § 157, which includes the allowance or disallowance of claims against the estate and counterclaims by the estate against persons filing claims against it. 28 U.S.C. § 157(b)(2)(B)-(C).  A bankruptcy court may hear related non-core claims but cannot finally resolve them. *See* 28 U.S.C. § 157(c)(1).  Even if a claim is statutorily core, it must also be constitutionally core for the bankruptcy court to have authority to issue a final order.  To be constitutionally core, the claim "stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process." *Stern v. Marshall*, 564 U.S. 462, 499 (2011).  If a claim is statutorily core but constitutionally non-core, it must be treated "as if it were statutorily non-core." *CashCall*, 781 F.3d at 70.

An estate's state-law counterclaim against a creditor "would necessarily be resolved in the claims allowance process" when it shares common questions of law and fact with the creditor's claim and when it "seek[s] to directly reduce or recoup the amount claimed." *TP, Inc. v. Bank of Am., N.A.*, 479 B.R. 373, 385 (Bankr. E.D.N.C. 2012).  If the estate's counterclaim can be resolved

without considering the creditor's claim, then the bankruptcy court lacks constitutional authority to hear the counterclaim.  Thus, "a counterclaim by the bankruptcy estate that seeks affirmative monetary relief to augment the estate but does not directly modify the amount claimed would not qualify as a claim to be resolved in ruling on the proof of claim." *Id.*

In *Moses v. CashCall*, the creditor filed a proof of claim in the Chapter 13 case and Moses objected on grounds that the loan agreement, which specified that any dispute would be resolved by arbitration, was illegal and void. 781 F.3d at 68.  Moses also filed an adversary proceeding asserting causes of action: (1) requesting a declaratory judgment that the loan agreement was illegal and void under North Carolina law; and (2) seeking damages under the North Carolina Debt Collection Act for the creditor's debt collection practices. *Id.*  The creditor sought to dismiss or stay the adversary proceeding and compel arbitration. *Id.*  The Fourth Circuit found the declaratory judgment claim was statutorily core under § 157(b)(2)(B) because it involved the allowance or disallowance of claims against the estate, and constitutionally core because "the validity of the Loan Agreement 'would necessarily be resolved' in adjudicating CashCall's proof of claim and Moses' objections thereto." *Id.* at 70 (quoting *Stern*, 564 U.S. at 499).  Therefore, the bankruptcy court had discretion to deny arbitration and such claim should not be sent to arbitration because "forcing Moses to arbitrate her constitutionally core claim would inherently conflict with the purposes of the Bankruptcy Code . . ." *Id.* at 73.

Conversely, no inherent conflict existed as to Moses' state law damages cause of action.  While this claim was statutorily core under § 157(b)(2)(C), it was not constitutionally core because it would not be resolved in the claims allowance process. *Id.* at 70-71.  Rather, resolution of this cause of action would merely augment the debtor's estate and:

> [a]lthough the success or failure of the non-core claim may have ancillary effects on Moses' bankruptcy – primarily through the enlargement of the underlying estate

due to any damages received – any such results are simply too attenuated, and indeed extrinsic to the bankruptcy, to constitute an "inherent conflict" with the Bankruptcy Code's purpose of facilitating an effective reorganization.

*Id.* at 82 (Gregory, J., concurring). Therefore, the bankruptcy court had no discretion to refuse to enforce arbitration as to the damages claim.

Huron filed proofs of claim against the estates for fees owed, and a review of the Amended Complaint does not indicate the State Law Claims against the Huron Defendants should be construed as merely counterclaims thereto. Notably, the Trustee's demands for his alleged counterclaims appear to eclipse any demands made in the proofs of claim in scope and amount. As put by the Huron Defendants, "it would be inequitable to allow the small tail of Huron's proofs of claims to wag the large dog of this Adversary Proceeding." (ECF No. 58 at 10). The Court also notes the initial complaint did not object to the proofs of claim or request they be disallowed. Even considering the additional allegations of the Amended Complaint, the State Law Claims are extrinsic to the Debtors' bankruptcies. Whether Huron and Kibbey breached alleged fiduciary duties and/or committed fraud and conspiracy will not "necessarily be resolved" in adjudicating amounts in Huron's proofs of claim. The Trustee's inclusion of a few allegations addressing Huron's proofs of claim is insufficient to meet his "heavy burden of showing a clearly expressed congressional intention that" inherent conflicts between arbitration and the Code exist here. *Epic Sys.*, 138 S. Ct. at 1621.

Further, unlike the declaratory judgment claim in *CashCall*, the Trustee does not dispute the validity of the Engagement Agreement. Instead, he argues any claim objection arises from Huron's alleged breach thereof and goes further to assert claims to augment the estate, which only tangentially relate to the claims allowance process. Absent these Chapter 7 cases, the Trustee's State Law Claims would be determined under state law by either an arbitrator or an appropriate non-bankruptcy court. If the State Law Claims are non-core, the Court has no discretion to

withhold arbitration over these causes of action. If the State Law Claims are core, the Trustee has not met his burden of demonstrating that arbitration of such constitutionally core claims inherently conflicts with the purposes of the Bankruptcy Code to permit the Court to exercise its discretion to refuse arbitration.

### D. OTHER CONSIDERATIONS

The Trustee argues other policy considerations must be considered, including inefficiency, parallel proceedings among the arbitration and remaining portions of this adversary proceeding, and additional litigation costs. Given the established policy favoring arbitration, the Court is not convinced the possible issues raised by the Trustee allow the State Law Claims to proceed before this Court. *See Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 217 (1985) (determining that if a case involves both arbitrable and nonarbitrable claims, the court is to enforce the parties' agreement and "not substitute its own views of economy and efficiency for those of Congress . . ." rather, the arbitrable claims are to be sent to arbitration, "even where the result would be the possibly inefficient maintenance of separate proceedings in different forums."); *Hays*, 885 F.2d at 1162 ("any bankruptcy-related concerns about delay and cost in the enforcement of a forum selection clause are not alone sufficient to overcome the policy favoring enforcement of such clauses, especially in non-core proceedings . . .").

### E. STAY OF BANKRUPTCY COURT LITIGATION

The FAA requires a court to stay "any suit or proceeding" if "satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement . . ." 9 U.S.C. § 3. "When confronted with litigants advancing both arbitrable and nonarbitrable claims, however, courts have discretion to stay nonarbitrable claims." *Klay v. All Defendants*, 389 F.3d 1191, 1204 (11th Cir. 2004) (citations omitted). "The decision whether to stay the litigation of the

non-arbitrable issues is a matter largely within the district court's discretion to control its docket." *Summer Rain v. Donning Co./Publishers, Inc.*, 964 F.2d 1455, 1461 (4th Cir. 1992), *as amended* (Jun. 23, 1992) (citing *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 20 n.23). "In this instance, courts generally refuse to stay proceedings of nonarbitrable claims when it is feasible to proceed with the litigation . . . Crucial to this determination is whether arbitrable claims predominate or whether the outcome of the nonarbitrable claims will depend upon the arbitrator's decision." *Klay*, 389 F.3d at 1204 (citations omitted).

There is some commonality of factual and legal issues among the Avoidance Actions and the State Law Claims, yet the latter claims predominate this dispute. The outcome of the Avoidance Actions will be affected by the outcome of the arbitration. For example, if an arbitrator finds the Huron Defendants did not breach the Engagement Agreement or any fiduciary duties and did not commit fraud or conspiracy, it may resolve issues as to whether Huron received reasonably equivalent value for the services rendered and whether such services were provided in the ordinary course of business pursuant to §§ 547 and 548. Further, the arbitrator's decision as to whether Huron breached the Engagement Agreement may implicate whether it is entitled to a distribution on account of the amounts set forth in its proofs of claim. Accordingly, the Court will stay adjudication here pending completion of the arbitration. Should arbitration of the State Law Claims fail to resolve the amount of Huron's claims, if any, that are allowed in this bankruptcy case, the parties may return to this Court for resolution of any remaining issues regarding the amount of any claim, and to pursue the Avoidance Actions, if appropriate.

## II.    STANDING – RULE 12(B)(1)

The Huron Defendants argue that to the extent the State Law Claims are asserted on behalf of the Debtors' creditors as opposed to the estate, they must be dismissed under Rule 12(b)(1).

Because those causes of action are subject to arbitration, this issue is now moot and does not need to be addressed by the Court.

### CONCLUSION

The State Law Claims alleged in the Amended Complaint, which predominate this matter, are clearly within the issues subject to arbitration under the Debtors' prepetition contract and are only tangentially related to the Chapter 7 cases. Therefore, the Court cannot ignore the strong precedent instructing it to adhere to such contractual provision and defer majority of this proceeding to arbitration. For the foregoing reasons, and having carefully considered the pleadings and applicable law, the Court concludes as follows:

1. the Trustee's Avoidance Actions against the Huron Defendants are not subject to the Engagement Agreement and are properly before this Court. Nevertheless, the Court will exercise its discretion to stay the Avoidance Actions pending arbitration of all other matters raised in this adversary proceeding;

2. all other causes of action asserted by the Trustee against the Huron Defendants are subject to arbitration as provided in the Engagement Agreement. Pursuant to 9 U.S.C. § 3, these claims are hereby stayed in this Court pending completion of arbitration. To the extent it is applicable, the automatic stay of 11 U.S.C. § 362 is lifted to the extent necessary to proceed with the arbitration; and

3. any further requested relief is denied.

**AND IT IS SO ORDERED.**
**FILED BY THE COURT**
**04/19/2022**



Chief US Bankruptcy Judge
District of South Carolina

Entered: 04/19/2022